**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEON TOMASZEWSKI** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.: 19-cv-0080** |
| | : | |
| **ALLSTATE INSURANCE COMPANY** | : | |
| *d/b/a Encompass Insurance* | : | |
| *a/k/a Encompass Indemnity* | : | |
| **Encompass.** | : | |

---

| | | |
|---|---|---|
| **LEON TOMASZEWSKI** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.: 19-cv-0133** |
| | : | |
| **ALLSTATE INSURANCE COMPANY** | : | |
| *d/b/a Encompass Insurance* | : | |
| *a/k/a Encompass Indemnity* | : | |
| **Encompass.** | : | |

## <u>MEMORANDUM</u>

**SITARSKI, M.J.**                                           **October 28, 2022**

Presently pending before the Court are Defendant's Motion for Summary Judgment
(Def.'s Mot. for Summ. J., ECF No. 86), Defendant's Statement of Undisputed Material Facts
(Def.'s Statement of Undisputed Mat. Facts, ECF No. 87), Defendant's brief in support of its
motion for summary judgment (Def.'s Br., ECF No. 88), Plaintiff's response to the summary
judgment motion (Pl.'s Resp., ECF No. 89), Defendant's reply brief in further support of its
motion (Def.'s Reply Br., ECF No. 90), and Plaintiff's sur-reply brief in further opposition to the
motion for summary judgment (Pl.'s Sur-Reply Br., ECF No. 94).[1]  For the reasons that follow,

---

[1]  Unless otherwise noted, the docket entry numbers for the record citations are from the
lead case: Case No. 19-cv-00080.  The other consolidated case is Case No. 19-cv-133.

Defendant's Motion for Summary Judgment shall be **GRANTED**.

## I.  FACTS[2]

After two separate automobile accidents, Plaintiff Leon Tomaszewski filed claims for underinsured motorist ("UIM") benefits with his insurer, Defendant Allstate Insurance Company d/b/a Encompass Insurance a/k/a Encompass Indemnity ("Encompass").  Of relevance to the present motion, he alleges that Encompass's handling of his claims violated Pennsylvania's bad faith statute.  Tomaszewski's breach of contract claims (and, by extension, his declaratory judgment claims) against Encompass have been settled.

### A.  The December 2, 2014 Accident Claim

At the time of the first accident on December 2, 2014, Tomaszewski was insured by an automobile insurance policy issued by Encompass ("Policy").  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87, at ¶ 2).  The Policy provides up to $250,000 in UIM coverage subject to all of the terms and conditions of the Policy.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-1, Ex. A).  It specifically includes the following coverage for UIM claims:

> **UNDERINSURED  MOTORORISTS  COVERAGE  SPLIT
> LIMITS – NON-STACKED – PENNSYLVANIA**

---

[2]  As required at this stage of the proceeding, the Court views the evidence in the light most favorable to Plaintiff as the non-moving party.  *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  In his sur-reply brief, Tomaszewski takes issue with Defendant's Response in Opposition to Plaintiff's Counter-Statement of Undisputed Material Facts.  (Pl.'s Sur-Reply Br., ECF No. 94, at 2-4).  He contends that Encompass's "[g]eneral denials to Plaintiff's statements of the facts on the grounds that the statements are based on 'a written document'" fail to address his factual assertions with respect to what was done (and not done) as part of Encompass's investigations, which thereby must be considered undisputed.  (*Id.*) (citing Resp. in Opp'n to Pl.'s Counter-Statement of Undisputed Mat. Facts, ECF No. 90-1; Fed. R. Civ. P. 56(c)(1), (e)(2)).  The Court accepts Tomaszewski's factual assertions to the extent they are supported by competent evidence in the record.

       *       *       *

**INSURING AGREEMENT**

We will pay compensatory damages which any **covered person** is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury
1.      Sustained by any **covered person**; and
2.      Caused by an **accident**.

(*Id.* at 52-53). The accident was reported to Encompass by Tomaszewski's counsel ("Plaintiff's Counsel") on December 4, 2014. (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 54).

On the same day, the claim was assigned to Donna Roncaioli, SCLA, as the claims handler, and she took responsibility for his claim for "Personal Injury Protection" ("PIP") benefits. (*Id.* at 46, 49-51; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 141). Another claims handler named Marianne Coffland, SCLA, was also added to the claim on December 4, 2014. (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2., Ex. B at 51-54). According to the claim file ("Claim Notes**)**, Coffland spoke to Plaintiff's Counsel, who "is requesting PIP apps and UIM claim be opened up." (*Id.* at 50). In a December 8, 2014 letter, Plaintiff's Counsel stated that "I am placing you on notice of potential UIM claim in this matter" and asked whether Coffland would be handling the UIM portion of the claim. (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-5, Ex. C). The Claim Notes indicated that on January 16, 2015 "Suffix status changed to: closed with subro pending." (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 48). Encompass processed and paid PIP benefits for the 2014 accident, and on August 20, 2015, it sent a letter to Plaintiff's Counsel stating that PIP had been exhausted. (Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 141).

On January 27, 2016, Plaintiff's Counsel sent a letter asking to settle the UIM claim for $250,000.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 46). In the Claim Notes, a notation was added on February 2, 2016 stating "split/re assigned," and the claim status was changed to "reopen."  (*Id.* at 46).  On February 4, 2016, the UIM claim was assigned to Michael McGrath, CLSA, and Coffland was removed from the matter.  (*Id.* at 45).

McGrath worked at Encompass/Allstate for more than thirty years.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89, at ¶ 9).  He testified at his deposition that he was "tired" and "needed a break" by the time he left the company in 2019.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 24:22-25:3).  Furthermore, McGrath had been deposed in two other bad faith lawsuits.  (*Id.* at 6:2-8.)  McGrath learned how to handle Pennsylvania uninsured motorists ("UM") and UIM claims mostly through on-the-job training, talking to counsel, and attending some seminars.  (*Id.* at 22:21-24:6, 47:7-48:5).  In 2005, he was transferred in a "lateral move" from a managerial position back to a claims handler position with no supervisory duties over any other claims representatives.  (*Id.* at 21:1-22:20).  At one time he had authority to settle claims for as much as $100,000, but he had no authority to settle claims outside of the valuation range generated by the "Colossus" computer system by the time he left the company.  (*Id.* at 89:12-90:15).  Encompass's UM/UIM department had six to eight adjusters (with two adjusters assigned to UIM matters) and one supervisor, and it was a part of Encompass's litigation department.  (*Id.* at 27:13-22, 181:16-182:2).  The supervisor at the time (Joseph Klein) had worked with McGrath for thirty-seven years (including twelve to fifteen years as his supervisor), and the two were friends outside of the office.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-7, Ex. E at 31:18-33:7).  Klein admitted that he had a level of comfort with McGrath given their years working together and was less

4

inclined to spend time supervising him than other employees.  (*Id.* at 34:14-35:12).  He met with McGrath in person every two weeks for "coaching sessions" (except for six months when Klein was responsible for both the litigation and non-litigation UIM claims).  (*Id.* at 47:10-49:11). From 2014 through 2019, McGrath was responsible for handling approximately 200 claims at a time.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 44:13-16).  He testified that having "lower pendings [] gives you more time to work them" (*id.* at 45:3-4) and explained that he would simply work overtime to ensure that the work was getting done (even though as a salaried employee he did not qualify for overtime pay) (*id.* at 46:4-18).

McGrath, working together with the evaluation coordinator, had the authority to handle and investigate claims valued as high as $100,000.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-7, Ex. E at 36:3-37:3).  Although he indicated that he was trained on and understood basic legal concepts when he worked for Encompass, McGrath could not remember at his deposition the burden of proof in a civil case, the regulatory time limits for investigating UIM claims, or the elements of damages recoverable in Pennsylvania.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 58:10-14, 59:21-60:21). But he was able to provide a definition of an "eggshell plaintiff" ("Just somebody who has preexisting conditions that was involved in an accident and aggravated those preexisting conditions") as well as an explanation of "the phrase that you take the plaintiff as you find them" ("That however, they were before the accident, that's how they were.  Like, if we aggravate –not we, but if they're in an accident and the condition is aggravated, then that's part of the claim.") (*Id.* at 57:16-58:9).  McGrath admitted that it was his duty as a UIM adjuster to conduct a full, fair, and prompt investigation of the facts of a claim.  (*Id.* at 46:19-22, 66:18-22, 117:7-19).  In addition to asking the insurer's attorney to produce medical records, McGrath was able to do ISO

and background searches, order surveillance, request an independent medical examination ("IME"), obtain a statement under oath from the insured, review the property damage and subrogation file, and speak with medical and other experts.  (*Id.* at 67:3-19, 73:2-74:6-68, 73:2-74:6).  Although he had access to the PIP notations in the Claim Notes, McGrath testified that he would not review the contents of the PIP files unless he received permission from the insured because the PIP claims are handled differently and that was "just the way it is."  (*Id.* at 67:20-68:1, 104:2-6).  He acknowledged that, even if represented by counsel, the insured has no obligation to investigate his or her own claim, to volunteer consent to release of the PIP file to the UIM adjuster, or to offer to give a statement under oath.  (*Id.* at 66:7-17, 117:7-19, 144:2-12; 156:3-10, 169:16-24).  "The terms of Plaintiff's policies provide that Defendant was obligated to investigate the claims and that Mr. Tomaszewski was only required to cooperate with its investigation."  (Pl.'s Counter-Statement of Undisputed Material Facts, ECF No. 89, at ¶ 13) (citing Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 66, 117).

According to Klein, authorizations to release medical information and to review the PIP file should be sent out on first contact with the insured or his or her representative.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-7, Ex. E at 88:7-13, 115:4-116:13).  Encompass's claims manual instructs adjusters to respond to any demands promptly by writing to the attorney and to provide the offer and basis for the offer in writing.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 94:1-95:9).  However, McGrath was unaware of the offer requirements, stating that his normal process was to call, explain the offer, and "and then send a letter with the offer in it."  (*Id.* at 92:20-93:1).

During his deposition, McGrath testified that, "with the UIM claim, you know, we

always give our insured the advantage rather than, you know, our insured is paying the premium so we do give them the advantage." (*Id.* at 65:17-20). "We tend to believe them – not believe but I mean we believe most people, but we don't question them quite as much." (*Id.* at 65:20-23). According to McGrath, he would input the information he obtained into the Colossus system, which would calculate the value of the claim. (*Id.* at 83:2-84:24). In turn, the evaluation coordinator would review the information that he "input into the system" to double check its accuracy. (*Id.* at 86:17-88:7). Asked if he ever evaluated the claims on his own to see if they matched up with the Colossus calculation, McGrath stated, "No, I don't think so." (*Id.* at 84:11-15). He explained that "I mean I probably had something in my head at the time, and if I thought it was low, I would say something" and, "[i]f I thought Colossus was low, I could bring it up." (*Id.* at 84:15-18). According to Tomaszewski, "Colossus has been the subject of multi-state litigation which resulted in part, in Defendant being required to notify consumers when it would be used in the evaluation of their claims, due to criticism that Colossus can be easily manipulated and the output of the software can be skewed, especially if data is not put in completely or correctly." (Pl.'s Counter-Statement of Undisputed Mat. Facts, ECF No. 89, at ¶ 23).

In considering the 2014 UIM claim, McGrath testified that he did not attempt to determine what future medical costs Tomaszewski would incur but that he instead would only view the existing medical records in determining future damages. (*Id.* at 110:20-112:21). In order to assess a claimant's pain and suffering, he would consider the contents of the medical records. (*Id.* at 113:8-12).

On February 4, 2016 (the day he was assigned to handle the 2014 UIM claim), McGrath reviewed Tomaszewski's claim and the available coverage under the Policy, noting that Tomaszewski had $250,000 in UIM benefits and that the other driver was responsible for

causing the accident.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B. at 41).

He also made the following notation in the Claim Notes:

> Leon Tomaszewski, age 67 at the time of the loss.  He had a prior lumbar decompression surgery in June of 2014 and after this loss he suffered from back pain radiating down a leg.  In April of 2015 he had a fusion at L3-5.  PIP had an IME done that related the additional surgery to this loss.  PIP paid their $10,000 limit so I anticipate a Medicare lien.

(*Id.*).  McGrath called and left a message for Plaintiff's Counsel requesting copies of "the medical specials" and prior medical records.  (*Id.* at 40).  According to the Claims File, McGrath telephoned Plaintiff's Counsel on February 5, 2016, and he noted that Plaintiff's Counsel was not in the office but that "they will provide me with the documentation that they do have."  (*Id.* at 39).  On February 9, 2016, Plaintiff's Counsel mailed a letter to McGrath stating that he would be kept informed regarding settlement discussions with the tortfeasor and any liens, authorizing McGrath to obtain the medical records that had been sent to the PIP adjuster, and enclosing supplemental medical records.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-4, Ex. D).  McGrath reviewed the letter the next day, noting that he requested the records from the PIP representative.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 39).  He obtained access to the PIP file on February 22, 2016.  (*Id.* at 38).

On February 23, 2016, McGrath noted that "we do not have a demand [for] settlement," "[t]he attorney is trying to negotiate with the liability carrier at this time," and "I will begin my review of the specials."  (*Id.* at 37).  On February 29, 2016, McGrath reviewed the medical records, and he provided the following summary of his review in the Claim Notes:

> Specials that were provided – Insured is 5ft7 and 226.  He was hit in the rear and went bowling after the accident.  He was upset about the loss as he had had back surgery several months before the [loss].  He treated with his PCP after the loss and he ended up having surgery in April 2015.

8

Dr. writes that he had a progression of stenosis.
Herniation at L3-4 on right = leg pain.
OR was due to lumbar stenosis, DDD and a herniation at L3-4.
First surgery was due to stenosis radiculopathy and sponydylollisthesis-Not6 a fusion and he did well – no radicular pain, minimal back pain and was highly functional.  After this MVA he had recurrent back pain and radicular pain.  A synovial cyst at L4-5 developed and a new herniation at L3-4 which caused the radicular symptoms.

(*Id.* at 35-36).

One of the medical records (dated December 5, 2014) reviewed by McGrath included the

following observations by Dr. Bernard Zoranski:

IMPRESSION/RECOMMENDATIONS:
MVA
CERVICAL SPINE INJURY
LUMBAR SPINE INJURY
CONCUSSION SYNDROME
INSOMNIA.
HAS MEDS . . . . For pain and muscle spasms from his recent surgery,
Of course, [our] big concern is his recent lumbar spine surgery and possible loosening of the area which was just repaired.
Patient does not realize he probably had a concussion does not remember everything that went on but he remembers having a great deal of-pain In

. . . .

At traffic light and stopped . . . car slid into him and the following. .
Instant pain in the neck on the left
No loc and could feel red and stress.
Got out of the car and police came and info exchanged
Pt [too] upset to think and did not go to the hospital and just left and went Bowling
home that [night] and was not feeling well and stiffness noted in neck and fell [off] to sleep and when he awakened in severe pain and stiffness in neck on the left.
Left hand was painful and hit hand on wheel . . . . . .
Car that hit him was some type of Pontiac he thinks.
Pt so upset he just wasn't thinking and he felt "out of it"
Now, 3 days later he has a HA and neck pain and spasms
Also, low back from the recent surgery is also hurting . . . as well

> and we called and has apt with the neurosurgeon . . . serious situation
> . . . with his recent extensive surgery . . . . . .

(Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, Ex. 89-9, Ex. G at 3-4).

In April 2015, Dr. Zoranski observed that Tomaszewski required lumbar fusion surgery and that "WITHIN A REASONABLE DEGREE OF MEDICAL CERTAINTY MVA IS A CAUSE." (*Id.* at 5). In the May 12, 2015 IME report ordered for the PIP claim, Dr. Jeffrey Rihn stated:

> He had undergone a previous lumbar decompression surgery back in June 2014. He did well after compression surgery until he was in a car accident where he was rear-ended on 12/02/2014. After the car accident, he has severe increased pain in his back going down his leg with associated numbness down his right leg. He also had neck pain after the accident, which has subsequently resolved with physical therapy. After the accident, back and leg symptoms worsened and he required revision surgery, which he had done approximately six weeks ago. In April 2015, he had L3-L5 fusion procedure with Dr. Stanley. Since his surgery, he has had improvement in his symptoms, but he does have known anterior thigh numbness, right side is greater than left. . . .
>
> . . . .
>
> . . . . I do not feel as though he has reached maximum medical improvement. He is only six weeks out from his lumbar fusion procedure particularly after lumbar fusion procedure and maximum medical improvement can occur anywhere from six months to one year following surgery depending on his way to recovery and development of effusion. I do not feel as though he has fully recovered from his accident.

(Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-10, Ex. H at 4-5). When asked at his deposition, McGrath did not recall whether he saw the IME report. (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 157:19-159:6).

McGrath further noted in the Claim Notes: "Completed my review of the specials and I need additional information to evaluate the claim. 1 – Prior to this MVA, the insured had surgery

that was aggravated by this loss.  I need the OR report from that surgery as well his f/u treatments.  I also need diagnostic reports that were taken before and after his surgery." (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 36).

Accordingly, on February 29, 2016, McGrath sent a letter to Plaintiff's Counsel, requesting medical records related to the June 2014 surgery and Tomaszewski's post-surgical treatment.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-5, Ex. E).  On March 7, 2016, an Encompass claims representative named Tammy Magnon left a telephone message with Plaintiff's Counsel requesting all medical records relating to Tomaszewski's 2014 surgery. (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 35).  Magnon and McGrath left additional messages for Plaintiff's Counsel on April 5, 2016, and May 5, 2016 and sent another letter on May 4, 2016.  (*Id.* at 33-34).  McGrath called the tortfeasor's insurer (State Farm) and left a message regarding the claim on July 6, 2016.  (*Id.* at 32).  In July 2016, Plaintiff's Counsel provided Encompass with the requested records, which McGrath reviewed on August 1, 2016.  (*Id.* at 29).  In her cover letter, Plaintiff's Counsel noted that the records showed that her client was recovering well from his prior surgery and making great improvements before the accident and stated that he would accept the UIM policy limits of $250,000.  (*Id.* at 29-30; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 154).

In the Claim Notes, McGrath made the following notation based on his review of the pre-accident medical records:

> Our loss is 12/2/14 and prior to this the insured had stenosis and narrowing in the cervical spine, C4-5, C5-6 and C6-7.
> Report of 4/25/14 from NeuroSurg states he has a long history of back pain.  Receiving injections for 10 yrs.
> He developed right foot drop.
> 5/6/14 – Right leg pain with walking.
> Need decompressive lumbar laminectomy L2-3, L3-4 L4-5.
> 6/10/14 – He had the surgery 6/11/14 Discharged from hospital.

11

> 6/26/F/U – doing well Very little pain, improved.
> 7/24 – Continued improvement (44 days post surg) Started PT and
> Home Ex.
> Wants to [bowl] in September.
> 8/26 – doing very well without significant pain.  No spasms.  Do not
> lift anything over 20-25 lbs.
> 10/24/14 – Low Back Pain with Post Exertion.  Gardening 3 weeks
> ago and had back pain which has diminished.
> Pain is likely related to spondylolisthesis.
> Doesn't state that he was bowling.

(Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 30).  McGrath noted that

"meds have been reviewed and now that I have lien info I can start to move forward" but that "I

still need proof of the liability limit" and he was thereby sending a letter to Plaintiff's Counsel

(even though he had spoken with the tortfeasor's insurer on July 6, 2016 and August 5, 2016).

(*Id.* at 29-30, 32).

According to Tomaszewski, "one of the medical records Mr. McGrath reviewed included

the follow-up in June 2014 of his pre-MVA surgery," stating:

> Chief Complaint:  left-low back pain post exertion
> History of present illness:
> about 3 weeks ago was gardening
> next day had severe LBP on left back
> lasted about a week
> diminishing – now almost gone
> was not down legs
> only low back
> some aching when active
> OK bowling
> Some soreness the next day.

(Pl.'s Resp. to Def.'s Statement of Mat. Facts, ECF No. 89, at ¶ 32) (emphasis omitted).  "Dr.

Stanley noted that Plaintiff had improved in gait and strength and recommended merely using a

back brace when exerting himself."  (*Id.* at ¶ 33).[3]

---

[3]  For support, Tomaszewski cites to a 2021 report from Dr. Nirav Shah.  (Pl.'s Resp.,
ECF No. 89-13, Ex. K).  The language he quotes does not appear in the report.  However,

On August 15, 2016, Plaintiff's Counsel sent a letter to McGrath stating that she did not have documentation of the tortfeasor's liability limits but was filing a complaint against the tortfeasor in the Delaware County Court of Common Pleas and expected to obtain the requisite documentation through the lawsuit.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-6, Ex. F).  She again requested that McGrath contact her to attempt a settlement of the UIM claim. (*Id.*).  On October 5, 2016, McGrath called State Farm, leaving a voicemail message asking about the status of the third-party liability claim.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 28).  He noted in the Claim Notes that, according to Plaintiff's Counsel, the tortfeasor had $50,000 in liability coverage.  (*Id.*).  On October 18, 2016, McGrath left a message for Plaintiff's Counsel and sent a letter to Plaintiff's Counsel requesting proof of the tortfeasor's liability limits.  (*Id.* at 27-28).  Magnon mailed another letter to Plaintiff's Counsel on November 21, 2016 regarding the status of the claim and proof of the liability limits.  (*Id.* at 27).  On December 7, 2016, Plaintiff's Counsel provided documentation to Encompass of the tortfeasor's $50,000 liability limit.  (Def.'s Statement of Undisputed Mat. Facts*, ECF No. 87-7, Ex. G; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 161-63).

Plaintiff's Counsel then mailed McGrath a letter on December 12, 2016, notifying him of a settlement offer from State Farm and requesting consent to settle.  (Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 165).  On December 16, 2016, she spoke with McGrath, who observed in the Claim Notes that the liability carrier had offered $45,000 to settle

---

Tomaszewski's quotations are consistent with the report as well as McGrath's own summary of the pre-accident medical records in the Claim Files.  (*See id.* at 20 ("Dr. Stanley's records following the June 2014 surgery indicate that the patient was making a good recovery and that his pain down his legs was almost gone, that he was cleared to return to bowling, and that he was better able to heel walk."); Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 30).

Tomaszewski's claim against the tortfeasor.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 26).  McGrath consented to the third-party settlement, preparing a letter confirming this consent on the same day.  (*Id.*; ECF No. 87-8, Ex. H).  It appears that the letter was mistakenly given to Roncaioli, who forwarded it to McGrath on January 10, 2017.  (Def.'s Statement of Undisputed Mat. Facts, ECF 87-2, Ex. B at 25).  Plaintiff's Counsel had followed up with McGrath about the missing written consent letter on January 3, 2017, and McGrath faxed the letter to her on January 10, 2017.  (*Id.*; Pl.'s Resp. to Def's Statement of Undisputed Mat. Facts, ECF No. 89-17, Ex. O).

On March 17, 2017, McGrath noted receipt of a Medicare statement from Plaintiff's Counsel, showing a lien of $12,703.65.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 82-2, Ex. B at 23).  On the same day, McGrath evaluated the UIM claim:

> Injury and Treatment: A GP visit on 12/5/14 for cervical & lumbar injuries & concussion syndrome.  8 follow-up visits 12/16/14 – 11/3/15 for cervical st/sprain & L3/4 herniated disc with lumbar surgery on 4/1/15.  18 chiro therapy visits for the neck & back 12/18/14 -2/16/15. 7 neurosurgeon visits 12/18/14 – 9/8/15.  Home Health aide 4/5/15 – 4/16/15 (X 5) & home therapy 4/7/15 – 5/6/15 (X 12).
> Comments:  Insd. has Full Tort coverage
> Questionable concussion in that it was mentioned at the 12/5/14 o.v. only.
> Insd. had prior back surgery on 6/10/14:  laminectomy, facetectomy &amp; foraminotomy L2/3, ¾ &amp; 4/5.
> Good recovery until the 12/2/14 auto accident, eventually resulting in surgery on 4/1/15:  L3/4 laminectomy, facetectomy, foraminotomy &amp; discectomy L3/4 laminectomy, facetectomy &amp; cyst removal @ L4 /5 with fusion @ both levels.

(*Id.* at 23-24).  McGrath also noted that he would verify the correct lien amount because the Medicare Recovery Portal showed a lien of $9,220 while Plaintiff's Counsel indicated an amount totaling $12,704.  (*Id.* at 24).  McGrath called Plaintiff's Counsel on March 22, 2017, leaving a message and advising her that he would be out of the office for the rest of the week.  (*Id.* at 22-

23).  An Encompass employee called again the next day, was told that counsel was home sick, and left a message.  (*Id.* at 22).

On March 27, 2017, McGrath called Plaintiff's Counsel and offered to settle the 2014 UIM claim for $75,000.  (*Id.*).  According to the Claim Notes:

> I called the attorney and spoke with her.  I advised her that there is a $50,000 liability credit and that her client had pre-existing issues. She pointed out that he did have surgery before this loss and that all of the medical reports state he was doing well until this loss – I agreed with her, but stated he is older and there is no question of his prior issues.  She stated that the meds show the impact aggravated his prior surgery and that a herniation at L3-4 was discovered after this MVA and he required surgery.  We did review the Medicare lien.  I stressed the liability credit and offered $75,000.  She will review and call me back.

(*Id.*).  The Claim Notes indicated that a follow-up letter was sent to Plaintiff's Counsel on April 5, 2017.  (*Id.* at 21).  Additional letters were sent on May 17, 2017 (stating that "[t]he UDBI claim remains open") and July 5, 2017 (stating that "[t]he Underinsured Motorist claim remains open").  (*Id.* at 19-20; Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 175, 177).  On August 9, 2017, McGrath called and left a message for Plaintiff's Counsel regarding the settlement offer. (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex B at 19).  He called and left additional messages on August 15, 2017, August 23, 2017, and October 30, 2017, and follow-up letters were sent out on October 5, 2017 and November 14, 2017.  (*Id.* at 18-19).

On January 3, 2018, McGrath called Plaintiff's Counsel and sent her a letter setting forth the $75,000 settlement offer.  (*Id.* at 18; Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-18, Ex. P).  Plaintiff's Counsel responded in writing on January 26, 2018, questioning the low offer given the serious and permanent injuries sustained by Tomaszewski, which continued to deteriorate and ultimately resulted in lumbar surgery, and asking if Encompass would agree to arbitration.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat.

15

Facts, ECF No. 89-19, Ex. Q).  She also noted that Encompass had never asked Tomaszewski to submit to a medical examination or provide any medical authorizations.  (*Id.*).  Plaintiff's Counsel inquired if there was anything that could be done to resolve the matter and if Encompass required anything more.  (*Id.*).

McGrath called Plaintiff's Counsel on February 7, 2018, offering $85,000 to settle the UIM claim:

> I called the atty and we went over the injuries and the surgery before and after our loss.  I stated that I do go back to review the claim and I advised that we can resolve for $85,000.  I stated that [this] is in addition to the $50,000 liability limit.
> She will let him know, but she is sure he will reject it.  She believes the case has a value of $200,000.
> Her letter of 1/26 did bring up arbitration – I advised I will assign DC and she agreed.  She will take the offer to her client but feels it is best if we assign DC now.

(Def.'s Statement of Undisputed Mat. Facts, ECF No. 17-2, Ex. B at 16).  On the same day, he mailed a letter setting forth the offer of $85,000 and noting that defense counsel was being assigned.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-20, Ex. R). McGrath also updated the Claim Notes to reflect an alleged demand in the "$200,000 area," the $85,000 offer, and State Farm's 100% share of liability as well as to note that Tomaszewski "had surgery before this loss and was doing well" but "[n]eeded to have a second surgery" and that Medicare had a lien.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 17-2, Ex. B at 16-17).

Encompass retained counsel, and, according to the file, Tomaszewski s "EUO" (examination under oath) was scheduled for August 7, 2018.  (*Id.* at 13).  The Claim Notes further indicated that Plaintiff's Counsel cancelled the "EUO" and the "Dep" (deposition) was rescheduled for January 16, 2019.  (*Id.* at 10, 13).  According to Tomaszewski, "house counsel

for Encompass, Gregory Mondjak, Esquire attempted to schedule a deposition of Plaintiff," but, "[w]hen Plaintiff contacted Mr. Mondjak by telephone and questioned why a deposition was being scheduled when the matter was not in suit, Mr. Mondjak cancelled the deposition."  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89, at ¶ 61).

On December 3, 2018, Tomaszewski filed a complaint in the Philadelphia County Court of Common Pleas, alleging claims for entry of a declaratory judgment in his favor declaring that he is entitled to coverage under the applicable UIM policy, breach of contract for failing to pay UIM benefits under the Policy, and bad faith under 42 Pa. Stat. and Cons. Stat. Ann. § 8371 with respect to his 2014 UIM claim.  (Notice of Removal, Case No. 19-cv-00133, ECF No. 1, at 8-18).  It is undisputed that the underlying UIM claim was ultimately settled for $160,000.  (*See, e.g.*, Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89, at ¶ 63).

### B. The February 20, 2016 Accident Claim

On February 20, 2016, Tomaszewski was involved in another motor vehicle accident. (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87, at ¶ 64; Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89, at ¶ 64).  He was insured under the same Policy in effect at the time of his December 2, 2014 accident.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87, at ¶¶ 65-67).

Encompass was notified of the accident on February 22, 2016, with the adjuster noting "UM/UIM . . . tbd."  (Def.'s Statement of Mat. Facts, ECF No. 87-10, Ex. J, at 8, 10).  Both Coffland and Roncaioli were initially assigned to the claim, and they acknowledged his prior claim arising out of the 2014 accident (and Coffland noted that there was 0% liability for Tomaszewski in the 2016 accident, where he was rear-ended).  (*Id.* at 4, 7, 10, 12).  Encompass processed and paid PIP benefits for medical care and treatment for injuries sustained in the 2016

accident.  (Notice of Removal, ECF No. 1, at 167-69).  In a March 17, 2016 letter, Plaintiff's

Counsel requested that Encompass open a UIM claim related to the 2016 accident.  (Def.'s

Statement of Undisputed Mat. Facts, ECF No. 87-21, Ex. S).  The UIM claim was then assigned

to McGrath.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-10, Ex. J at 19).  The PIP

file contained a signed authorization releasing Tomaszewski's medical records.  (Pl.'s Resp. to

Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-10, Ex. D at 101:24-103:24).

On March 18, 2016, McGrath reviewed the claim and the available coverage (noting that

the insured had $250,000 in UIM benefits and that he had responsibility for adjusting

Tomaszewski's prior claim) and set up "UDBI" for the claim.  (Def.'s Statement of Undisputed

Mat. Facts, ECF No. 87-10, Ex. J at 19).  In addition to leaving a telephone message for

Plaintiff's Counsel, he also called the tortfeasor's insurer (Progressive) inquiring about the

amount of liability coverage.  (*Id.* at 20).  McGrath left another message for Plaintiff's Counsel

on March 23, 2016.  (*Id.* at 23).  On the same day, Progressive told him that the tortfeasor had

$15,000 in liability coverage.  (*Id.*)  An Encompass agent noted the following on April 6, 2016:

> R/o PIP concurrency – Leon is the named Insd ELIGIBLE for
> MEDICARE.
> INJURIES: severe neck, and back sprains Right arm and Right leg
> pain.
> No E/R seeing Dr Sing (D.O.)
> W/L: None
> Will monitor tx – he had a previous loss which I handled.

(*Id.* at 29).  On April 7, 2016, McGrath again called Progressive, saying (according to the Claim

Notes) that: "[T]hey have in a statement from the insured and to date the attorney hasn't agreed

to it.  They have cervical lumbar strain and spr.  Their insd did strike our insured in the rear but it

was a minimal impact – They want a statement."  (*Id.*).  McGrath called Plaintiff's Counsel on

April 7, 2016, leaving a voicemail message.  (*Id.*).

On May 9, 2016, Plaintiff's Counsel sent Encompass a signed notice of claim, which indicated that Tomaszewski had "severe neck and back pain" and was being treated by Dr. Sing and Dr. Stanley. (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-23, Ex. U). McGrath acknowledged receipt of the claim notice on May 17, 2016, indicating that the injuries were neck and back pain. (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-10, Ex. J at 32). According to the Claim Notes, a letter was sent to Plaintiff's Counsel on May 24, 2016 regarding the claim. (*Id.* at 34). Magnon also called Plaintiff's Counsel on May 23, 2016 asking for information regarding her client's treatment status. (*Id.* at 29).

On June 7, 2016, the following entry was made in the Claim Notes:

> [H]e is treating but they do not have any records yet.
>
> On 3/10 Leon saw the Neurosurgeon just for a follow up – he is feeling better, much better when active – takes quite a bit of meds-
>
> DX: Spondylolisthesis – pre existing w/ a flare up w/ this loss.
>
> Looks like just monitoring – f/u was left open.
>
> I am closing down the file for now. – no active tx

(*Id.* at 37.). The PIP adjuster (Roncaioli) likewise noted on June 7, 2016 that she was closing the coverage "due to lack of tx and insd feeling better." (*Id.* at 38). Once a month from June 2016 to December 2016 (except for November 2016), Magnon called Plaintiff's Counsel, asking about the 2016 claim and Tomaszewski's treatment status. (*Id.* at 39-45). In the notation for the September 26, 2016 telephone call, the claims professional specifically noted that, according to Plaintiff's Counsel, Tomaszewski was still undergoing treatment, "[s]he would not provide any treatment or lost wage details at this time," and "[s]he would only advise that he is still treating." (*Id.* at 43). The representative also sent a letter to Plaintiff's Counsel regarding the status of the claim every month from August to November 2016. (*Id.* at 41-45). On September 27, 2016,

Plaintiff's Counsel requested the PIP ledger, which was faxed to Plaintiff's Counsel on the same day.  (*Id.* at 41-45).

In January 2017, Magnon again telephoned and sent a letter to Plaintiff's Counsel concerning the claim.  (*Id.* at 46).  The bills submitted by Tomaszewski's medical providers were reviewed on January 24, 2017, with the Claim Notes indicating that "starting at 05/02/2016—the cervical, thoracic, and the lumbar spines are all treated on the same date of service" and that "[i]t will be hard to separate the notes and the tx/billing."  (*Id.* at 47-48).  On January 27, 2017, McGrath received a telephone call from Tomaszewski's neurologist's office while Tomaszewski was at the office for an appointment asking about insurance coverage, and McGrath directed the individual to contact the PIP representative.  (*Id.* at 47).

On February 15, 2017, Magnon mailed another letter inquiring about the status of the 2016 claim to Plaintiff's Counsel.  (*Id.* at 47).  On March 7, 2017, the PIP adjuster made the following entry in the Claim Notes:

> In my DV – within the past week I have rec d over 40 bills from different providers for Leon on the 02/20/16 loss.
>
> The bill for 02/02/2017 for Leon's sleep apnea and hypertension to Crozier Keystone was denied as not MVA related.
>
> RUN DOWN:
>
> First accident: 4/2015 had lumbar spine issues / w/litigation pending BENEFITS EXHAUSTED on the L/S.
>
> * * * *
>
> Second accident 02/[20/2016] there was $476.75 paid out relaying to cervical spine E/R issues. – last date bill paid was for was d/o/s 03/10/2006 this was all the cervical spine/ x ray/ injury issues.
>
> The file was closed.
>
> * * * *

> Fast forward a year later all the bills submitted were [for] the
> LUMBAR SPINE. – denied all.
>
> I called Maria at Springfield Sports and she did not seem surprised
> at, as to what I explained to her.  She appreciated the call very much
> Denied all bills in [queue] after reviewing each and every one.
>
> Not reopening this file.

(*Id.* at 48).  Roncaioli denied all bills that did not use the term "cervical" and denied everything

to do with a lumbar injury.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No.

89-24, Ex. V).

Magnon called Plaintiff's Counsel on March 24, 2017, and McGrath called again on

April 3, 2017.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-10, Ex. J at 50-51).

According to the Claim Notes, Plaintiff's Counsel informed McGrath "that the insured is still

treating and receiving injections – They did not have updated meds and will not request them

until treatment is over."  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-10, Ex. J at

51).  He further noted that "I believe the injections are to the lumbar spine–prior surgery there

and the claim is that it was aggravated by this loss."  (*Id.*).  Because he knew that Tomaszewski

was a bowler, McGrath indicated that surveillance might be appropriate, and his supervisor

ultimately approved surveillance on April 27, 2017.  (*Id.* at 51, 53).  On April 21, 2017,

Roncaioli had made the following entry in the Claim Notes:

> Today in my DV and in the bill [queue] – I have rec d 8 new bills
> from Bernard Soranski, SDO 04/2016 >>>. referring to the surgery
> of 04/01/2015 THIS DOES NOT APPLY TO the 02/20/2016 loss.
>
> **The note states "Patient presents to the office w/follow up from
> surgery 04/01/2015 fused 3, 4, and 5 and herniated 1-2, 6 screws"
> also a visit note 05/21/2015 regular check up—The previous loss
> was Benefits Exhausted.**
>
> **These bills have nothing to do w/my 2016 loss, and am denying**

> **as such.  I have rev d each bill and some of these bills should go
> to Medicare as they have nothing to do w/ an accident of any
> year.**

(*Id.* at 52).

Magnon called Plaintiff's Counsel regarding Tomaszewski's treatment status every

month from May 2017 to November 2017 as well as in May 2018.  (*Id.* at 53, 55, 59-60, 61, 65).

According to the Claim Notes, letters were also sent to Plaintiff's Counsel once a month from

May to December of 2017.  (*Id.* at 54, 56, 58-61).  E-mails were sent on February 13, 2018 as

well as March 16, 2018.  (*Id.* at 62, 64).  Meanwhile, Tomaszewski was under surveillance for

ten months, ending in March 2018, and he was not seen bowling or engaging in any other

physical activity.  (*Id.* at 63).

On May 15, 2018, Plaintiff's Counsel sent a letter to McGrath advising him that the third-

party insurer had tendered its $15,000 liability limit.  (Def.'s Statement of Undisputed Mat.

Facts, ECF No. 89-25, Ex. W).  On May 15, 2018, McGrath noted the settlement of the third-

party claim in the Claim Notes, and, after ordering a social media check of Tomaszewski on June

13, 2018, McGrath consented to the settlement on June 30, 2018.  (Def.'s Statement of

Undisputed Mat. Facts, ECF No. 89-10, Ex. J at 65-66; ECF No. 87-4, Ex. D at 152:4-153:9).

Additional letters regarding the claim were mailed to Plaintiff's Counsel on June 14, 2018, July

19, 2018, September 26, 2018, and November 7, 2018.  (*Id.* at 66-67, 69).  On July 18, 2018,

August 22, 2018, October 3, 2018, and November 13, 2018, Jennifer Bruno (a claims

representative) or McGrath called Plaintiff's Counsel about the claim.  (*Id.* at 67-69).  On

October 3, 2018, Bruno was advised that Tomaszewski was still being treated by Dr. Sing and

was receiving injections in the lower back.  (*Id.* at 69).  Plaintiff's Counsel further told McGrath

on November 13, 2018 that "she has no DX results, lost wage info or bill total to date."  (*Id.*).

McGrath likewise noted that, on November 13, 2018, he was told that Tomaszewski continued to receive treatment, specifically injection therapies, from Dr. Sing.  (*Id.*).  On December 15, 2018, McGrath observed that Tomaszewski had a prior loss and back surgery in 2015 and that, although the counsel had not yet provided any "specials," "[f]rom new loss the back was probably aggravated."  (*Id.* at 70).

On December 3, 2018, Tomaszewski filed a complaint in the Philadelphia County Court of Common Pleas, alleging claims for entry of a declaratory judgment in his favor declaring that he is entitled to coverage under the applicable UIM policy, breach of contract for failing to pay UIM benefits under the Policy, and bad faith under § 8371 with respect to his underlying 2016 UIM claim.  (Notice of Removal, ECF No. 1, at 10-18).  The parties subsequently settled the UIM claim for $150,000.  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89, at ¶ 124 n.4).

## II.    PROCEDURAL HISTORY

Encompass removed both complaints to this Court on January 9, 2019.  (Notice of Removal, ECF No. 1; *id.*, Case No. 19-cv-00133, ECF No. 1).  On July 19, 2019, the parties consented to my jurisdiction, and the Honorable C. Darnell Jones, III, referred the cases to me. (Consent to Jurisdiction & Order, ECF No. 12; Consent to Jurisdiction, Case No. 19-cv-00133, ECF No. 10; Consent & Order, Case No. 19-cv-00133, ECF No. 11).  The two cases were consolidated on October 22, 2019.  (Order, ECF No. 23; *id.*, Case No. 19-cv-133, ECF No. 14).

On March 14, 2022, Encompass moved for summary judgment.  (Def.'s Mot. for Summ. J., ECF No. 86).  Tomaszewski filed his opposition to the summary judgment motion on April 4, 2022.  (Resp., ECF No. 89).  As part of his response, he submitted an expert report from Stuart J.

Setcavage, AIC, CCLA, of Setcavage Consulting LLC.  (Pl.'s Statement of Undisputed Mat. Facts, ECF No. 89-26, Ex X).  Encompass filed a reply brief in further support of its motion on April 11, 2022.  (Def.'s Reply Br., ECF No. 90).  Tomaszewski filed a motion to permit a sur-reply, which Encompass opposed.  (Mot. to Permit Pl. to File Sur-Reply, ECF No. 91; Resp. in Opp'n to Motion to Permit Pl. to File Sur-Reply, ECF No. 92).  On July 29, 2022, the Court granted the motion, and Tomaszewski's sur-reply brief was docketed.  (Order, ECF No. 93; Pl.'s Sur-Reply Br., ECF No. 94).

## III.   LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-moving party.  *Id.*  It is not the Court's role to weigh the disputed evidence and decide which is more probative or to make credibility determinations.  Rather, the Court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  *See, e.g.*, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88; *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the Court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 158-59 (1970)).

The moving party bears the initial burden of demonstrating that there is no genuine issue

of material fact.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the

moving party carries this initial burden, the non-moving party must come forward with specific

facts showing there is a genuine issue for trial.  *See, e.g.*, *Matsushita Elec. Indus. Co.*, 475 U.S.

at 587.  The non-moving party must present something more than mere allegations, general

denials, vague statements, or suspicions.  *See, e.g.*, *Trap Rock Indus., Inc. v. Local 825, Int'l*

*Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v.*

*DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Instead, the non-moving party must present

specific facts and "affirmative evidence in order to defeat a properly supported motion for

summary judgment."  *Anderson*, 477 U.S. at 257.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citing *Dombrowski*

*v. Eastland*, 387 U.S. 82 (1967) (per curiam); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391

U.S. 253, 290 (1968)).  If the non-moving party has the burden of proof at trial, then that party

must establish the existence of each element on which it bears the burden.  *See, e.g.*, *Celotex*

*Corp.*, 477 U.S. at 322-23.

## IV.    DISCUSSION

42 Pa. Stat. and Cons. Stat. Ann. § 8371 provides insureds with a statutory cause of

action against insurers for acting in bad faith:

> In an action arising under an insurance policy, if the court finds that
> the insurer has acted in bad faith toward the insured, the court may
> take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the
> claim was made by the insured in an amount equal to the prime rate
> of interest plus 3%.
>
> (2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

The statute does not define "bad faith," but Pennsylvania courts have interpreted it as "any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent." *O'Donnell ex rel. Mitro v. Allstate Ins. Co.,* 734 A.2d 901, 905 (Pa. Super. Ct. 1999) (quoting *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super. Ct. 1994); *Terlestky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).

"Under Pennsylvania law, a plaintiff can only recover for bad faith of an insurer under 42 Pa. C.S. § 8371 if he or she shows, by clear and convincing evidence, that the insurer: (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) (citing *W.V. Realty, Inc. v. N. Ins. Co.*, 334 F.3d 306, 311 (3d Cir. 2003)); *see also, e.g.*, *Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 377 (Pa. 2017) (same). "[M]ere negligence or bad judgment is not bad faith." *O'Donnell*, 734 A.2d at 905 (quoting *Romano*, 646 A.2d at 1232 (Pa. Super. Ct. 1994); *Terlestky*, 649 A.2d at 688). An insured bringing a bad faith claim must meet the heightened standard of "clear and convincing evidence." *See, e.g.*, *MGA Ins. Co. v. Bakos*, 669 A.2d 751, 754 (Pa. Super. Ct. 1997). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Sylvester*, 555 A.2d 1202, 1203-04 (Pa. 1989) (citing *In re LaRocca Trust*, 192 A.2d 409, 413 (Pa. 1963)). This requirement is critical because it heightens the plaintiff's burden in opposing the defendant's motion for summary judgment. *See, e.g.*, *Quaciari v. Allstate Ins. Co.*, 998 F. Supp. 578, 581 (E.D. Pa. 1998) (citing *Anderson*, 177 U.S. at 254), *aff'd*, 172 F.3d 860 (3d Cir. 1998) (unpublished table decision). In short, the

plaintiff's burden at the summary judgment stage is "commensurately high because the court must view the evidence in light of the substantive evidentiary burden at trial." *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (quoting *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999), *aff'd*, 234 F.3d 1265 (3d Cir. 2000)).

Bad faith claims are fact-specific in nature and depend on the conduct of the insurer vis-à-vis the insured. *See, e.g.*, *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006). The bad faith framework applies to UM/UIM claims, but such claims do not impose a heightened duty on the insurer. *See, e.g.*, *id.* UIM claims are similar "to first party claims insofar as the disclosure of policies and coverage terms are concerned," but they also closely resemble third-party claims "on issues such as liability, damages, coverage, or even procedure." *Id.* at 1144 (citation omitted). "Simply stated, they are inherently and unavoidably arms' length and adversarial." *Id.* (citation omitted).

Although "the essence of a bad faith must be the unreasonable and intentional (or reckless) denial of benefits," the alleged bad faith "need not be limited to the literal act of denying a claim." *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 506 (3d Cir. 2004) (citing *Cresswell v. Pa. Nat'l Mut. Cas. Ins. Co.*, 820 A.2d 172, 180 (Pa. Super. Ct. 2003); *O'Donnell*, 734 A.2d at 904). "Bad faith claims cover a range of conduct relating to the improper denial of benefits under the applicable contract." *Velazquez v. State Farm Fire & Cas. Co.*, CIVIL ACTION NO. 19-cv-2128, 2020 WL 1942784, at *10 (E.D. Pa. Mar. 27, 2020) (citing *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 199 (Pa. 2007)), *R. & R. adopted by* 2020 WL 1939802 (E.D. Pa. 2020).

"To begin with, 'the insurance company must conduct a meaningful investigation, which may include an in-person interview, examination under oath, medical authorizations and/or

medical examinations.'"  *Baum v. Metro. Prop. & Cas. Ins. Co.*, CIVIL ACTION NO. 2:16-CV-623, 2019 WL 4689024, at *5 (W.D. Pa. 2019) (quoting *Mineo v. Geico*, No. 12-1547, 2014 WL 3450820, at *6 (W.D. Pa. Jul. 15, 2014)).  The insurer also cannot exclusively focus on information that weighs against the insured while failing to consider the evidence supporting the insured's claim.  *See, e.g.*, *Mohney v. Am. Gen. Life Ins. Co.*, 116 A.3d 1123, 1136 (Pa. Super. Ct. 2015).  "The insurance company is not required to show that the process used to reach its conclusion was 'flawless or that its investigatory methods eliminated possibilities at odds with its conclusion.'  Instead, the insurance company is only required to show that it conducted an investigation 'sufficiently thorough to yield a reasonable foundation for its action.'"  *Viscounte v. Liberty Mut. Grp.*, No. 11-CV-6387, 2012 WL 6524980, at *6 (E.D. Pa. Dec. 14, 2012) (quoting *Cantor v. Equitable Life Assur. Soc'y of U.S.*, 1999 WL 219786, at *2 (E.D. Pa. Apr. 12, 1999)).  Accordingly, "an insurance company's substantial and thorough investigation of an insurance claim, forming the basis of the company's refusal to make payments, establishes a reasonable basis that defeats a bad faith claim as a matter of law."  *Id.* (citing *Cantor*, 1999 WL 219786, at *2).

Furthermore, an unreasonable delay in investigating and processing a claim may rise to the level of a bad faith practice.  *See, e.g.*, *Murphy v. United Fin. Cas. Co.*, CIVIL ACTION NO. 15-4199, 2016 WL 1555926, at *3 (E.D. Pa. Apr. 18, 2016).  "But, 'a long period of delay between demand and settlement does not, on its own, necessarily constitute bad faith.'"  *Id.* (quoting *Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 370 (E.D. Pa. 2011)).  The plaintiff must show that the "delay is attributable to the defendant, that the defendant had no reasonable basis for the actions it undertook which resulted in the delay, and that the defendant knew or recklessly disregarded the fact that it had no reasonable basis to deny payment."  *Id.* (quoting

*Thomer*, 790 F. Supp. 2d at 370).  In other words, to prevail on a "bad faith delay" claim, the insured must prove that the insurer "(1) 'had no reasonable basis for causing the delay' and (2) 'knew or recklessly disregarded the lack of a reasonable basis for the delay.'"  *Parisi v. State Farm Mut. Auto. Ins. Co.*, CIVIL ACTION NO. 3:16-179, 2018 WL 2107774, at *11 (E.D. Pa. May 7, 2018) (quoting *Mirachi v. Seneca Specialty Ins. Co.*, 564 F. App'x 652, 655-56 (3d Cir. 2014)).  A delay attributable to uncertainty of the claim's value, the need to investigate further, or even the insurer's own negligence does not constitute bad faith.  *See, e.g.*, *id.*

   "A claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought.  An insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to 'send a message.'"  *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 382 (Pa. Super. Ct. 2002).  "Rather, it has a duty to compensate its insureds for the fair value of their injuries."  *Id.* "Low-ball offers which bear no reasonable relationship to an insured's actual losses can constitute bad faith within the meaning of § 8371."  *Parisi*, 2018 WL 2107774, at *11 (quoting *Seto v. State Farm Ins. Co.*, 855 F. Supp. 2d 424, 430 (W.D. Pa. 2012)).  However, an insurer is not required to submerge its own interest, and it must instead accord the interests of the insured the same consideration as its own interest.  *Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 571 (E.D. Pa. Feb. 22, 2000), *aff'd*, 261 F.3d 495 (3d Cir. 2001).  A low yet still reasonable estimate of the loss does not rise to the level of bad faith.  *See, e.g.*, *Parisi*, 2018 WL 2107774, at *11.  Disagreement over the amount of the settlement of a UIM claim is not unusual, and "the failure to immediately accede to a demand for a policy limit cannot, without more, amount to bad faith."  *Smith v. State Farm Mut. Auto. Ins. Co.*, 506 F. App'x 133, 137 (3d Cir. 2012).  As the Pennsylvania Superior Court has indicated, it is improper to find that an insurer operated in bad

faith where there is "a normal dispute between an insured and an insurer over the value of a UIM claim." *Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 785 (Pa. Super. Ct. 2009). "To permit this action to proceed under these facts would invite a floodgate of litigation any time an arbitration award is more than an insurer's offer to settle, even though an award is substantially below the insured's demand." *Id.*

Although not itself a per se violation of the bad faith standard, an insurance company's failure to comply with applicable insurance statutes and regulations may be relevant in determining whether it has acted reasonably or deviated from industry standards. *See, e.g.*, *Wagner v. Progressive Corp.*, Civil No. 5:20-cv-05407-JMG, 2021 WL 6137027, at *2 (E.D. Pa. Dec. 29, 2021). Tomaszewski notes that a state insurance regulation requires an insurer to complete the claim investigation within 30 days of notification unless the investigation cannot reasonably be completed in this time period in which case the insurer must provide a written explanation for the delay and state when a decision on the claim may be expected every 45 days, 31 Pa. Code § 146.6; *see also* 31 Pa. Code § 146.1 (stating that chapter defines certain minimum standards which, if violated with frequency indicating existence of general business practice, will be deemed to constitute unfair claims settlement practices). (Pl.'s Br., ECF No. 89-2, at 20). Additionally, Pennsylvania's Unfair Insurance Practices Act provides that:

> Any of the following acts if committed or performed with such frequency as to indicate a business practice shall constitute unfair claim settlement or compromise practices:
>
> . . . .
>
> (iii)  Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.
>
> (iv)   Refusing to pay claims without conducting a reasonable investigation based upon all available information.

. . . .

> (vi)  Not attempting in good faith to effectuate prompt, fair and
> equitable settlements of claims in which the company's liability
> under the policy has become reasonably clear.

40 Pa. Stat. and Cons. Stat. Ann. § 1171.5(a)(10).  Furthermore, the duty to act in good faith

applies to the insured as well as the insurer.  *See, e.g.*, *Jung v. Nationwide Mut. Fire Ins. Co.*, 949

F. Supp. 353, 360-61 (E.D. Pa. 1997).

According to Encompass, it is entitled to summary judgment because "there was a

genuine dispute over the value of Plaintiff's UIM claims." (Def.'s Br., ECF No. 88, at 5)

(emphasis omitted).  It further argues that "Plaintiff's own conduct mitigates any finding of bad

faith on the part of Encompass."  (*Id.* at 14) (emphasis omitted).  Denying there was any genuine

dispute regarding the value of his UIM claims, Tomaszewski contends that "Encompass failed to

fully, fairly, promptly, and in good faith conduct a meaningful investigation and evaluation of

Plaintiff's UIM claims."  (Pl.'s Br., ECF No. 89-2, at 1).  "Indeed, Encompass unreasonably

failed to offer any reasonable offers of settlement for the claims, forced Mr. Tomaszewski to

institute suit in order to recover the benefits due and owed to him under his policy for which he

had made all payments and met all contractual obligations, and Encompass knew of or recklessly

disregarded its lack of reasonable basis for acting or failing to act in these ways."  (*Id.*).

In its reply brief, Encompass states that "Plaintiff's 'throw it at the wall' approach to his

response to Encompass's Motion for Summary Judgment should be rejected" because, although

his opposition "is replete with unsupported allegations and conclusory statements, there is no

actual evidence that this case involves anything other than a genuine dispute over value."  (Def.'s

Reply Br., ECF No. 90, at 1).  "Simply put, Plaintiff disagreed with Encompass's evaluation of

his claims," and, according to Encompass, "[t]hat does not mean that Encompass has acted in

bad faith." (*Id.*).  Encompass also insists that it did investigate the UIM claims.  (*Id.* at 2-3).  It further argues that the Setcavage report is inadmissible and should not be considered for purposes of its motion for summary judgment.  (*Id.* at 3-13).  Tomaszewski defends the admissibility of the expert report in his sur-reply brief.  (Pl.'s Sur-Reply Br., ECF No. 94 at 5-16).  He also asserts that Encompass's reply brief and response to his counter-statement of facts did not "address the extensive facts and case law that support finding Plaintiff has clear and convincing evidence of Defendant's bad faith."  (*Id.* at 1).

Viewing the evidence in the light most favorable to Tomaszewski (and taking into account the proffered expert report), the Court concludes that a reasonable finder of fact could not find that there is clear and convincing evidence of bad faith on the part of Encompass as to either the 2014 or the 2016 UIM claims.  In short, a reasonable jury could not find that Tomaszewski has presented clear and convincing evidence that Encompass lacked a reasonable basis for its handling of his claims and, even if Encompass did lack such a basis, either knew or recklessly disregarded its absence.  Because the expert report does not change this outcome, the Court need not (and does not) rule on Encompass's evidentiary challenge to Setcavage's report. *See, e.g.*, *Kosierowski*, 51 F. Supp. 2d at 595 ("The mere presence of an expert opinion supporting the non-moving party does not necessarily defeat a summary judgment motion; rather, there must be sufficient facts in the record to validate that opinion.") (citing *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1198-99 (3d Cir. 1995)).

### A.     The December 2, 2014 Accident Claim

As to the 2014 UIM claim, Tomaszewski contends that Encompass acted in bad faith by failing to undertake a prompt and meaningful investigation and by making unreasonable settlement offers.  (Pl.'s Br., ECF No. 89, at 20-28).  He also claims that "[t]here was no genuine

dispute over the value of Plaintiff's UIM claims because Defendant failed to establish a value of the claims by not conducting a full, fair, thorough, and prompt investigation as it was obligated." (*Id.* at 28) (emphasis omitted). The Court begins with Encompass's investigation of the 2014 claim.

### 1.      The Investigation of the 2014 Claim

In its opening brief, Encompass does not offer a detailed defense of the investigation it conducted on the 2014 UIM claim. It does state that, "[i]n response to Plaintiff's claims for UIM benefits, Encompass assigned an experienced claims professional who timely investigated and evaluated Plaintiff's UIM claims and communicated with Plaintiff's counsel." (Def.'s Br., ECF No. 88, at 1)**.** Claiming that "there was a dispute regarding the value of Plaintiff's claims," it asserts that, "[w]ith respect to the 2014 accident, Encompass was entitled to a $50,000 credit due to the liability coverage available to the driver responsible for causing the accident" and that "Plaintiff had pre-existing conditions related to his spine, including a lumbar decompression surgery in June 2014." (*Id.* at 13). Furthermore, "Encompass requested an examination under oath of Plaintiff in order to continue its evaluation of Plaintiff's alleged injuries, Plaintiff's counsel cancelled the examination under oath and filed this lawsuit before Encompass was able to obtain Plaintiff's testimony." (*Id.* at 13-14).

Tomaszewski responds that, "[a]s in *Parisi* and *Rancosky,* the evidence here clearly shows that Defendant wholly failed to conduct a meaningful investigation of these claims in a timely manner." (Pl.'s Br., ECF No. 89-2, at 24) (discussing *Parisi*, 2018 WL 2107774; *Rancosky v. Wash. Nat'l Life Ins. Co.*, 130 A.3d 79 (Pa. Super. Ct. 2015), *aff'd*, 170 A.3d 364 (Pa. 2017)). According to him, "[d]espite Plaintiff's attorney requesting an UIM claim be opened shortly after the accident in 2014, Defendant ignored the request until February 2016,

after Plaintiff provided a demand for UIM settlement." (*Id.*) (citing Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 46, 52-54). Even though McGrath found that Tomaszewski was doing well after his surgery and before the accident, he still asked for the pre-accident medical files. (*Id.*). In turn, "[d]espite having all the medical records he had requested from Plaintiff in August 2016, Defendant then waited 1 ½ years – until January 3, 2018 – to provide a written settlement offer of only $75,000, which did not include the basis of the offer, as required by Defendant's own policy." (*Id.*) (citing Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 179; Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex D at 94-95). Additionally, "Mr. McGrath never asked for an interview, never requested authorizations to obtain medical records directly, never utilized a nurse or peer review of the medical records, never asked for a statement under oath, [and] never asked for an IME." (*Id.* at 26). Tomaszewski points out that "Defendant only requested an IME *after* it had made its low-ball settlement offer and assigned counsel to this case." (*Id.* at 32) (citing Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 13).

Tomaszewski questions how exactly the claims representative used the information he had in his possession to evaluate the claim. McGrath purportedly "relied on Colossus (computer program), without doing his own independent evaluation, to determine the value of the claim despite criticisms that Colossus can be easily manipulated, and the output of the software can be skewed, especially if data entry is incomplete." (*Id.* at 27) (citing Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 83-84, 88; ECF No. 89-26, Ex X at 16). Tomaszewski also indicates that, given McGrath's unfamiliarity with "the elements of compensable damages," "it is unclear how he could possibly have input any meaningful information into the Colossus program to calculate an accurate damages assessment." (*Id.*).

34

Noting that "a claims adjuster is not permitted to simply focus on information that might support a denial while ignoring contrary information," Tomaszewski asserts that McGrath "tried to justify his evaluation by noting that Plaintiff had surgery prior to the accident and he was older, even though Encompass recognized that Plaintiff had improved from that surgery before the December 2014 accident." (*Id.*) (citing *Rancosky*, 130 A.3d at 98; Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 17; Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-26, Ex. X at 13). "As Plaintiff's expert explains, if the prior surgery made Plaintiff more pre-disposed to getting reinjured, he cannot be penalized for that. Further, the insured cannot be penalized for being older. Claim professionals are trained and should understand application of the 'thin skull' rule and how to evaluate injuries to 'egg-shell' claimants." (*Id.*) (citing Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 13). Finally, Tomaszewski asserts that "McGrath did not even attempt to determine what future medical costs the Plaintiff would incur or [his] pain and suffering" and instead "would only view medical records in determining a claimant's pain and suffering" even though he purportedly acknowledged that, "if a medical provider did not comment on such injuries in the treatment records, the adjuster would not know about them." (*Id.* at 28) (citing Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 113-16; *Parisi*, 2018 WL 2107774, at *15).

In its reply brief, Encompass addresses the issue of whether it conducted a prompt and meaningful investigation in more detail than it did in its opening brief. It contends that "Plaintiff ignores Encompass's repeated, ongoing efforts to communicate with Plaintiff's counsel." (Def.'s Reply Br., ECF No. 90, at 2). Encompass observes that it made a settlement offer on March 17, 2017, shortly after Tomaszewski had settled the third-party claim and had provided Encompass

with lien documentation.  (*Id.*) (citing Def.'s Statement of Undisputed Mat. Facts, ECF No. 89, at 40-45).  It further indicates that the claims representative "attempted to contact Plaintiff's counsel on eleven occasions between April 2017 and February 2018, but did not receive the courtesy of a return call, email, or letter," and, "[o]n February 7, 2018, Encompass's representative finally had a telephone conversation with Plaintiff's counsel, who refused to engage in meaningful discussion and instead told Encompass to assign defense counsel."  (*Id.*) (citing Def.'s Statement of Undisputed Mat. Facts, ECF No. 89, at 49-60).  In his sur-reply brief, Tomaszewski states that "Defendant fails to address [in its reply brief] any of the applicable law cited by Plaintiff," thereby confirming that "Plaintiff's evidence of Encompass's bad faith is clear and convincing where Defendant failed to conduct any meaningful investigation."  (Pl.'s Sur-Reply Brief, ECF No. 84, at 4) (citing *Parisi*, 2018 WL 2107774, at *11; *Rancosky*, 130 A.3d at 94; *Mohney*, 116 A.3d at 1136).

Encompass could have conducted its investigation into the 2014 UIM claim more promptly.  It also arguably could have done more to investigate the value of the claim.  However, mere negligence does not give rise to a bad faith claim, and an insurer need not undertake a "flawless" investigation.  *See, e.g.*, *Viscounte*, 2012 WL 6524980, at *6; *O'Donnell*, 734 A.2d at 905.  "Instead, the insurance company is only required to show that it conducted an investigation 'sufficiently thorough to yield a reasonable foundation.'"  *Viscounte,* 2012 WL 6524980, at *6 (quoting *Cantor*, 1999 WL 219786, at *2).  The Court concludes that Encompass has satisfied this standard.  A reasonable finder of fact could not find that Tomaszewski has proven by clear and convincing evidence that "[all of] the delay is attributable to the defendant, that the defendant had no reasonable basis for the actions it undertook which resulted in the delay, and that the defendant knew or recklessly disregarded the fact that it had no reasonable basis to deny

payment," *Murphy*, 2016 WL 1555926, at *3 (quoting *Thomer*, 790 F. Supp. 2d at 370).

Admittedly, Encompass took no direct action on the UIM claim between December 2014 (when Plaintiff's Counsel first provided notice of a potential UIM claim) and February 2016 (when Encompass reopened the claim and reassigned the matter to McGrath, who began investigating the claim). (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 45-47, 50; Pl.'s Resp., to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-5, Ex. C; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 139). However, it did process and pay Tomaszewski PIP benefits for the 2014 accident, which were exhausted as of August 2015. (Pl.'s Mot. to Consolidate, ECF No. 17-5, Ex. B at 141). There was also a potential third-party claim against the tortfeasor and its insurer. (*See, e.g.*, Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 53). After Plaintiff's Counsel sent a letter specifically asking for $250,000 to settle the UIM claim, Encompass promptly reopened and reassigned the claim—and, once assigned, McGrath immediately began to gather information and to evaluate the claim itself. (*Id.* at 45-47). At most, Encompass's initial delay in acting on and investigating Tomaszewski claim constituted negligence or carelessness as opposed to a knowing or reckless attempt on its part to deny or delay payment. *See, e.g.*, *Parisi*, 2018 WL 2107774, at *11; *Murphy*, 2016 WL 1555926, at *3.

In addition, "[a] delay attributable to the uncertainty of the claim's value or the insurer's need to investigate further does not constitute bad faith." *Parisi*, 2018 WL 2107774, at *11 (quoting *Great Lakes Reinsurance (UK) PLC v. Stephens Garden Creations, Inc.*, 119 F. Supp. 3d 297, 306 (E.D. Pa. 2015)). On the same day he was assigned to handle the UIM claim (February 4, 2016), McGrath reviewed the claim and the available coverage under the Policy and called Plaintiff's Counsel requesting her client's medical records. (*Id.* at 40). By the end of

February 2016, the claims representative had obtained access to the medical records submitted in connection with Tomaszewski's PIP claim, which included an IME conducted by Dr. Rihn.  (*Id.* at 38).  On February 29, 2016, McGrath performed a review of the medical records and sent a letter to counsel requesting medical records relating to the June 2014 surgery and post-surgical treatment.  (*Id.* at 35-36; Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-5, Ex. E).  It was reasonable for Encompass to take the time to request and then review pre-accident medical documentation given the evidence it already had of pre-existing medical conditions.  *See, e.g.*, *Shaffer v. State Farm Mut. Auto. Ins. Co.*, Civil Action No. 1:13-cv-01837, 2014 WL 5325340, at *7 (M.D. Pa. Oct. 20, 2014) ("Medical records were especially important in this case because of Plaintiff's extensive history of medical ailments that predated the motor vehicle accident. Therefore, Plaintiff's medical condition both pre- and post-accident accident needed to be established to identify what ailments were caused by the accident."), *aff'd*, 643 F. App'x 201 (3d Cir. 2016).  Telephone messages requesting the medical records concerning the pre-accident surgery were left on March 7, 2016, April 5, 2016, and May 5, 2016, and another letter was sent out on May 4, 2016.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 32-35).  On July 1, 2016, Encompass was finally provided with the requested records, which McGrath reviewed a month later. (*Id.* at 29; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 154).

No further medical documents were obtained, and Encompass did not make its first settlement offer until March 2017.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 22).  But Encompass did not remain idle, and there were for reasons for any delay on its part.  In his August 1, 2016 notation, McGrath acknowledged that "meds have been reviewed and now that I have lien info I can start to move forward"—while also stating that "I still need

proof of the liability limit." (*Id.* at 29). A letter was accordingly sent to Plaintiff's Counsel, and there were additional letters and messages regarding the third-party claim throughout the remainder of 2016 (with Plaintiff's Counsel providing proof of the tortfeasor's $50,000 liability limit by the end of the year). (*Id.* at 27-28; Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-6, Ex. F at 2; ECF No. 87-7, Ex. G; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 161-63). McGrath was notified of the offer to settle by the tortfeasor's insurer in a December 12, 2016 letter, and he orally consented to the settlement a few days later in a December 16, 2016 conversation with Plaintiff's Counsel. (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, at 26; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 165). Although a letter confirming Encompass's consent was prepared the same day, it was mistakenly given to Roncaioli (who did not return it to McGrath until January 10, 2017), Plaintiff's Counsel followed up on January 3, 2017, and McGrath faxed the consent letter on January 10, 2017. (Def.'s Statement of Undisputed Material Facts, ECF No. 87-2, Ex. B at 25-26; ECF No. 87-8, Ex. H; Pl.'s Resp. to Def.'s Statement of Mat. Facts, ECF No. 89-17, Ex. O).

Tomaszewski asserts that the "first written settlement offer" was not made until January 3, 2018. (Pl.'s Br., ECF No. 89-2, at 24) (citing Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-18, Ex. P). However, the Claim Notes indicated that McGrath had called Plaintiff's Counsel months earlier on March 27, 2017 and made a settlement offer of $75,000. (Def.'s Statement of Undisputed Mat. Facts, ECF No. 82-2, Ex. B at 22). Before making this offer, the claims representative had received a Medicare statement setting forth the lien amount on March 17, 2017, had conducted an evaluation of the UIM claim (and noted a discrepancy in the lien figures he had been provided), and had attempted to contact Plaintiff's Counsel on March 22, 2017 and March 23, 2017. (*Id.* at 22-24). According to the Claim Notes,

McGrath then had followed up on the $75,000 oral offer in April, May, August, October, and

November of 2017.  (*Id.* at 18-21; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 175,

177).  Plaintiff's Counsel did not respond until after McGrath had sent out the January 3, 2018

letter.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 18; Pl.'s Resp. to

Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-18, Ex. P).  After receiving counsel's

January 26, 2018 negative response to this offer, McGrath offered $85,000 on February 7, 2018

and indicated that defense counsel was being assigned in this matter.  (Def.'s Statement of

Undisputed Mat. Facts, ECF No. 82-7, Ex. B. at 16; Pl.'s Resp. to Def.'s Statement of

Undisputed Mat. Facts, ECF No. 89-9, Ex. Q; ECF No. 89-20, Ex. R).

It is true that "McGrath never asked for an interview, never requested authorizations to

obtain medical records directly, never utilized a nurse or peer review of the medical records,

never asked for a statement under oath [at least prior to making the two offers], [and] never

asked for an IME."  (Pl.'s Br., ECF No. 89-2, at 26).  However, he did request and obtain from

Plaintiff's Counsel medical records dating from both before and after the accident.  (Def.'s

Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 30-35, 39, 41; ECF No. 87-4, Ex D;

ECF No. 87-5, Ex. E; Pl.'s Mot. to Consolidate Cases, ECF No. 17-5, Ex. B at 154).  Even

though he did not order an IME, McGrath obtained access to the medical records in the PIP file,

which included an IME report.  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-4, Ex.

B at 38.).  McGrath could not remember at his subsequent deposition whether he saw the actual

IME report, but he, at the very least, did acknowledge in the Claim Notes that "PIP had an IME

done that related the additional surgery [i.e., the April 2015 surgery] to this loss."  (*Id.* at 41;

Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 157:19-159:6).

After the settlement offers were rejected and Encompass had retained counsel, it did try to obtain

a statement under oath or deposition from Tomaszewski.  (*Id.* at 10, 13; Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89, at ¶¶ 61-62).

In addition, the Claims Notes make clear that McGrath undertook a thorough review of the medical records he had obtained.  As part of this review, he highlighted both the parts of the record supporting Tomaszewski's claim as well as the aspects weighing against it.  *See, e.g.*, *Mohney*, 113 A.3d at 1135-36 ("Carroll's misrepresentations constitutes evidence that his investigation was neither honest nor objective, as it would appear that he focused solely on those parts of the questionnaires' answers that supported denial of the claim, while ignoring the important limitations recognized by Dr. Miller and Mohney that supported a contrary decision."). In his initial notation, McGrath observed that Tomaszewski "had a prior lumbar decompression surgery in June of 2014" while adding that "after this loss" he suffered from back pain radiating down one of his legs, he had fusion surgery, and the PIP IME "related the additional surgery to this loss."  (Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 41).  McGrath observed that Tomaszewski had gone bowling after the accident.  (*Id.* at 35).  But he also pointed out that Tomaszewski had received treatment from his primary care physician after the accident and then had surgery in April 2015.  (*Id.*).  According to McGrath, he "did well" after his first surgery with "no radicular pain, minimal back pain and was highly functional."  (*Id.* at 35-36). After the accident, "he had recurrent back pain and radicular pain," "[a] synovial cyst at L-4-5 developed," and there was "a new herniation at L3-4 which caused the radicular symptoms." (*Id.*).  In his review of the pre-accident records, McGrath summarized Tomaszewski's medical conditions and treatment history, noting, inter alia, that Tomaszewski had stenosis and narrowing in the cervical spine at C4-5, C5-6, and C6-7, and a long history of back pain and injections.  (*Id.* at 30).  Having developed problems with his right foot and leg, he underwent a "decompressive

lumbar laminectomy L2-3, L3-4 L4-5." (*Id.*).  Following the surgery, his condition improved
(i.e., "Discharged from hospital," "doing well Very little pain, improved," "Continued
improvement (44 days post surg) Started PT and Home Ex," "doing very well without significant
pain.  No spasms"), although he was instructed not to lift anything over 20 to 25 lbs., suffered
from low back pain after gardening, and evidently had yet to start bowling again despite his
desire to do so.  (*Id.*).  In his final evaluation he performed before making the initial settlement
offer, McGrath again summarized Tomaszewski's course of treatment after the accident (noting
that there was a "[q]uestionable concussion in that it was mentioned at the 12/5/14 o.v. only"),
noted that he had prior back surgery on June 18, 2014 ("laminectomy, facetectomy, &amp;
foraminotomy L2/3, 3/4 &amp; 4/5"), and acknowledged that Tomaszewski made "a good
recovery until the 12/2/14 auto accident, eventually resulting in surgery on 4/1/15" ("L3/4
laminectomy, facetectomy, foraminotomy &amp; discectomy L3/4 laminectomy, facetectomy
&amp; cyst removal @ L4 /5 with fusion @ both levels.").  (*Id.* at 23-24).

Relying on the expert report, Tomaszewski asserts that there were several discrete
deficiencies with McGrath's investigation and evaluation of the 2014 UIM claim, including
violations of statutory and regulatory standards, his failure to assess future medical bills and pain
and suffering, his improper reliance on Tomaszewski's past injury and age, his reliance on a
purportedly flawed computer program, and the claims representative's lack of familiarity with
the elements of compensable damages.  (Pl.'s Br., ECF No. 89-2, at 20-33).  None of these
alleged deficiencies rose to the level of bad faith conduct.

Initially, given the investigation that was conducted in this matter, there does not appear
to be a genuine dispute of material fact as to whether Encompass either failed "to adopt and
implement reasonable standards for the prompt investigation of claims arising under insurance

policies," 40 Pa. Stat. and Cons. Stat. Ann. § 1171.5(a)(10)(iii), or refused "to pay claims

without conducting a reasonable investigation based upon all available information," 40 Pa. Stat

and Cons. Stat. Ann. § 1171.5(a)(10)(iv).  Even if Encompass did not technically comply with

the regulatory requirement to complete the investigation within 30 days (or, if this cannot

reasonably be done, provide the claimant with written notice every 45 days thereafter), *see* 31 Pa.

Code § 146.6, an insurer's failure to comply with statutory and regulatory requirements does not

constitute bad faith per se, and, based on what McGrath did do in this matter as well the ongoing

"back and forth" communications with Plaintiff's Counsel over the course of the investigation,

any violations that may have been committed were insufficient to give rise to a claim of bad

faith, *see, e.g.*, *Wagner*, 2021 WL 6137027, at *2.

        McGrath indicated at his deposition that he only looked at the existing medical records to

determine both future damages as well as pain and suffering.  (Pl.'s Resp. to Def.'s Statement of

Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 110:20-112:21, 113:8-12).  However, an

insurance company need not conduct a "flawless" investigation, *see, e.g.*, *Viscounte*, 2012 WL

6524980, at *6, and, as the Claim Notes indicated, the medical records did include several

references to Tomaszewski's pain (*see, e.g.*, Def.'s Statement of Undisputed Mat. Facts, ECF

No. 87-2, Ex. B at 30 ("Right leg pain with walking," "Very little pain, improved," "doing very

well without significant pain," "Low Back Pain with Post Exertion.  Gardening 3 weeks ago and

had back pain which has diminished," "Pain is likely related to spondylolisthesis"); 35-36

("After this MVA he had recurrent back pain and radicular pain"), 41 ("back pain radiating down

a leg")).

        As to Tomaszewski's remaining challenges to Encompass's investigation and evaluation,

he does not point to any actual evidence that the use of the Colossus computer program

negatively affected his specific claim for UIM benefits.  He instead relies on general assertions made by his expert about how Colossus can be easily manipulated and how its output can be skewed, especially if data is not entered correctly or completely (as well as the expert's contention that the insured should have been advised of its use).  (*See* Pl.'s Br., ECF No. 89-2, at 27, 31).  It appears undisputed that, "[a]s Plaintiff's expert explains, if the prior surgery made Plaintiff more pre-disposed to getting reinjured, he cannot be penalized for that" or merely for his age.  (*Id.* at 27) (citing Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-26, Ex. X at 13).  However, it is also clear that the insurer was free to investigate the causal link between the 2014 accident and the alleged injuries.  As Setcavage himself indicated, Encompass would not be liable (or its liability would be reduced) if there was medical support "relied upon by [Encompass] that [Tomaszewski] would have necessitated the second surgery if not but for the crash."  (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-26, Ex. X at 13).  McGrath also was able to provide at his deposition a definition of an "eggshell plaintiff"— "Just somebody who has preexisting conditions that was involved in an accident and aggravated those preexisting conditions."  (Pl.'s Resp. to Def's Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. B at 57:16-19).  He likewise offered an explanation of "the phrase that you take the plaintiff as you find them"—"That however they were before the accident, that's how they were. Like, if we aggravate – not we, but if they're in an accident and the condition is aggravated, then that's part of the claim."  (*Id.* at 57:24-58:9).  Finally, even if McGrath "had been demoted in what he described as a 'lateral move' to a non-managerial position, had been the subject of at least two bad faith claims, and was tired and needed a break from handling more than 200 claims with little to no oversight due to a friendly relationship with his [also very busy] supervisor" (Pl.'s Br., ECF No. 89-2, at 4), McGrath was still a trained and experienced claims representative

44

who worked for Encompass/Allstate for more than thirty years (Pl.'s Resp. to Def.'s Statement

of Undisputed Mat. Facts, ECF No. 89, at ¶ 9; ECF No. 89-6, Ex. D at 22:21-24:6, 47:7-48:5).[4]

---

[4] The parties (especially Tomaszewski) cite to several cases in support of their respective positions in this matter. Given the fact-specific nature of bad faith claims, *see, e.g.*, *Condio.*, 899 A.2d at 1143, it is not surprising that the decisions they cite are factually distinguishable.

The facts in *Parisi* do appear somewhat similar to the factual circumstances of Encompass's own investigation into the 2014 UIM claim. In *Parisi*, the district court denied the insurance company's motion for summary judgment on the grounds that a jury could find that it acted in bad faith because, "in the eighteen months between when Parisi filed her claim and when [her attorney] demanded settlement, State Farm failed to conduct a meaningful investigation, and made no attempts to settle." *Parisi*, 2018 WL 2107774, at *14. Specifically, the claims representative reviewed the extensive medical records in Parisi's first-party claims file in the summer of 2014, which revealed that she suffered a serious head injury, but did not complete an injury evaluation for the claimant until March 2015 and did not place a valuation on the claim until April 2015. *Id.* Even though the claims representative concluded that the accident caused the claimant's injuries and the treatment appeared reasonable and necessary, the insurer did not offer to settle, took little, if any, action for the next six months, and did not request a statement under oath or an independent medical examination until early 2016. *Id.* In a footnote, the district court indicated that a reasonable jury could find that State Farm was responsible for most of the delay in this case, the plaintiff's attorney regularly supplied State Farm with medical records when they became available, and the insurance company had "robust records from Parisi's first-party claims file from the beginning." *Id.* at *14 n.163 (distinguishing *Thomer* and *Richardson v. United Fin. Cas. Co.*, NO. CIV.A. 14-7688, 2013 WL 235719 (E.D. Pa. May 30, 2013)).

However, the *Parisi* court acknowledged that "[t]his is a close call," *id.*, and the case evidently did not involve pre-existing medical conditions or a surgery performed months before the accident. This Court also questioned whether a reasonable finder of fact could have found there was clear and convincing evidence that State Farm "unreasonably delayed settling Parisi's claim . . . with reckless disregard to the fact that it acted unreasonably." *Id.* Denying Parisi's own motion for summary judgment, the district court noted that her attorney acknowledged that he "told State Farm that he usually did not work with claims representatives until he settled the underlying claim with the other driver," which did not occur until March 2015. *Id.* at *12 (footnote omitted). Counsel in *Parisi* then did not make an actual settlement demand until January 2016, which prompted State Farm to resolve the claim. *Id.*

Tomaszewski emphasizes the Pennsylvania Superior Court's bad faith ruling in *Rancosky*. Unlike Encompass, the insurer conducted no investigation at all before terminating the disability policy despite receiving conflicting, uninformed, and incorrect documentation as to the insured's disability date as well as eight authorizations permitting the insurance company to contact the insured's physicians, employer, and others. *Rancosky*, 130 A.3d at 93-97. After the plaintiff requested reconsideration, the insurance company merely reviewed the information

2.      **Encompass's Settlement Offers on the 2014 Claim and Genuine Disputes of Material Fact as to the Value of Tomaszewski's Claim**

According to Encompass, it is entitled to summary judgment because there was a genuine dispute over the value of Tomaszewski's 2014 UIM claim—and "a genuine dispute over the value of Plaintiff's claim does not rise to the level of bad faith."  (Def.'s Br., ECF No. 88, at 5-14).

Tomaszewski argues that, "due to its insufficient investigation [and over three years after receiving notice of the 2014 claim], Defendant, on January 3, 2018, provided an unreasonably low settlement offer of $75,000."  (Pl.'s Br., ECF No. 89-2, at 27) (citing Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-18, Ex. Pl; Pl.'s Mot. to Consolidate Cases, ECF 17-5, Ex. B at 179; *Parisi*, 2018 WL 2107774, at *11; *Lewis v. Mid-Century Ins. Co.*, Civil Action No. 17-1409, 2019 WL 1651530, at *15 (W.D. Pa. Apr. 17, 2019)).  He contends that "Defendant's failure to conduct a meaningful investigation in a timely manner, coupled with Defendant's low-ball offer . . . which bear no reasonable relationship to Plaintiff's actual loss, constitute clear and convincing evidence of bad faith conduct to withstand summary judgment." (*Id.* at 28).  According to Tomaszewski, "the facts, however, do not support[] Encompass's contention [that, if there were a genuine dispute over the value of the claim, Encompass's actions did not rise to the level of bad faith]," and "any dispute over the value of the claims was due to Encompass's failure to properly conduct a meaningful investigation, as discussed above."  (*Id.* at 28-29).  Tomaszewski endeavors to distinguish the case law cited by Encompass.  (*Id.* at 28-32).

---

already in its possession.  *Id.* at 97-99.  The *Rancosky* court also refrained from deciding "whether the evidence of record supports a finding regarding the second prong [of the bad faith test] (i.e., that Conseco knew of or recklessly disregarded its lack of a reasonable basis in denying benefits to LeAnn)" and accordingly directed the trial court to address this issue on remand.  *Id.* at 98-99 (citing *Terletsky*, 649 A.2d at 688).

In the process, he again challenges the meaningfulness of the investigation and evaluation performed by McGrath as well as the claims representative's own knowledge of basic legal concepts, insisting that "the value of Plaintiff's claim was only in dispute because Defendant wholly failed to conduct a meaningful investigation." (*Id.* at 32) (emphasis omitted).  He also contends that McGrath reviewed the pre-accident medical record "and confirmed that Plaintiff had, in fact, improved after the pre-accident surgery, before the 2014 accident" and that "there was no conflicting medical evidence here to make Encompass's low-ball offer reasonable." (*Id.* at 29).

In its reply brief, Encompass asserts (in passing) that, "[w]hile Plaintiff's motion is replete with unsupported allegations and conclusory statements, there is not actual evidence that this case involves anything other than a genuine dispute over value." (Def.'s Reply Br., ECF 90, at 1).  "Simply put, Plaintiff disagreed with Encompass's evaluation of his claims.  That does not mean that Encompass has acted in bad faith." (*Id.*).  According to Encompass, "Plaintiff asserts that there was a genuine dispute over value because Encompass initially offered 'only' $75,000 and then $85,000, and ultimately agreed to settle that claim for $160,000." (*Id.* at 2).  "But Plaintiff ignores his $250,000 policy limit settlement demand.  The $160,000 settlement was, in fact, closer to Encompass's offers of $75,000 and $85,000 then it was to Plaintiff's $250,000 demand.  A routine dispute over the value of an insured's bodily injury claim is not bad faith." (*Id.*).  Tomaszewski contends in his sur-reply brief that Encompass does not address the extensive facts and case law set forth in his submissions and mischaracterizes the case as merely involving a difference in valuation.  (Pl.'s Sur-Reply Br., ECF No. 94, at 1, 4).  He again insists that Encompass did not conduct a meaningful investigation.  (*Id.*).

Because this Court rejects Tomaszewski's challenge to the meaningfulness of the

investigation (*see supra* Section IV.A.1), it also must reject his challenge to the offers insofar as it is based on an allegedly deficient investigation.  In turn, the Court concludes that a reasonable finder of fact could not find that Tomaszewski has proven by clear and convincing evidence that Encompass acted in bad faith in making the two settlement offers.

"Low-ball offers which bear no reasonable relationship to an insured's actual losses can constitute bad faith within the meaning of § 8371." *Parisi*, 2018 WL 2107774, at *11 (quoting *Seto*, 855 F. Supp. 2d at 430); *see also, e.g.*, 40 Pa. Stat. and Cons. Stat. Ann. § 1171.5(10)(vi) (stating that to attempt in good faith to effectuate prompt, fair, and equitable settlement once liability has become reasonably clear may constitute unfair claim settlement or compromise practices).  However, a low yet still reasonable estimate of the loss does not rise to the level of bad faith.  As this Court has already explained, Encompass conducted a thorough (although perhaps not flawless) investigation and considered the medical documentation it received (including evidence regarding his pain and suffering) weighing for and against Tomaszewski's claim for UIM benefits.  (*See supra* Section IV.A.1.).  It then made a reasonable opening offer of $75,000 based on this review and, having received a negative response from Plaintiff's Counsel, raised the offer by $10,000.  (*See* Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 16-19; Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-18, Ex. P; ECF No. 89-19, Ex. Q; ECF No. 89-20, Ex. R).

As Encompass observes in its opening brief (Def.'s Br., ECF No. 88, at 6, 12)., it is not unusual for the insured and his insurer to disagree over the value of the claim.  *See, e.g.*, *Smith*, 506 F. App'x at 137.  Accordingly, even an undervaluation of a claim "does not represent clear and convincing proof that the insurer undervalued the claim out of some ill-will or that its actions had no reasonable basis." *Zappile v. Amex Assurance Co.*, 928 A.2d 251, 261 (Pa. Super. Ct.

2007) (footnote omitted) (citing *Williams v. Nationwide Mutual Ins. Co.*, 750 A.2d 881 (Pa. Super. Ct. 2000)).  In addition, such disagreement over the value of a claim is even more likely to occur where the claim involves more subjective components such as pain and suffering.  *See, e.g.*, *Williams*, 83 F. Supp. 2d at 575 ("A large component of the claim involved pain and suffering, loss of life's pleasures and loss of consortium, all of which reasonable minds could differ in quantifying.  *See Keefe v. Prudential Property and Cas. Ins. Co.*, 203 F.3d 218, 226 (3d Cir. 2000) (citations omitted) (noting that the pain and suffering and general damages elements of a claim are inherently flexible).") (footnote omitted).  Cases like this one involving apparent pre-existing medical conditions also further complicate the valuation process.  *See, e.g.*, *Shaffer*, 2014 WL 5325340, at *7 n.5.  It also must not be overlooked that Encompass did not simply deny the UIM claim; it instead made an offer of $75,000 and then increased its offer to $85,000. *See, e.g.*, *Johnson*, 987 A.2d at 785 ("Appellee never denied benefits; rather the dispute centered upon the measure of damages.").  The claim was ultimately settled for $160,000, substantially higher than Encompass's offers but also far below Tomaszewski's own demand of $250,000.  In fact, "[t]he $160,000 settlement was . . . closer to Encompass's offers of $75,000 and $85,000 than it was to Plaintiff's $250,000 demand."  (Def.'s Reply Br., ECF No. 90, at 2).  The Pennsylvania Superior Court upheld a decision granting summary judgment in favor of the insurance company where, inter alia, "[t]he [$75,000] award was actually lower than Appellant's demand [of $100,000] and represented a middle ground between the offer [of $30,000] and the demand."  *Id.*  Like the award in *Johnson*, the settlement of the 2014 claim "certainly bore no resemblance to the award made in *Hollock*, which was twenty-nine times higher than the insurer's offer."  *Id.* (addressing *Hollock v. Erie Ins. Exch.*, 842 A.2d 409 (Pa. Super. Ct. 2004) (en banc)).  In the end, while Encompass evidently undervalued the 2014 claim initially, "[t]he

49

underlying facts involve nothing more than a normal dispute between an insured and insurer over the value of an UIM claim," *id.*[5]

### B.   The February 20, 2016 Accident Claim

According to Encompass, it assigned "an experienced claim professional who timely investigated and evaluated Plaintiff's UIM claims and communicated with Plaintiff's claim." (Def.'s Br., ECF No. 88, at 1).  It claims that there was a dispute regarding the value of the 2016

---

[5] Although Tomaszewski is correct that the complaint in *Smith* was dismissed as conclusory under Rule 12(b)(6) (Pl.'s Br., ECF No. 89-2, at 30 n.3) (citing *Smith*, 506 F. App/x at 137), it is undisputed that the *Smith* court accurately summarized the basic principles governing bad faith claims. Tomaszewski further observes that the insurer in *Johnson* conducted a meaningful investigation (including an IME) and that the defendant in *Zappile* valued the claim based on the opinions of counsel and its own evaluation of the injury sustained.  (*Id.* at 30-31) (citing *Johnson*, 987 A.2d at 782-83; *Zappile*, 938 A.2d at 261).  The Court, however, has already considered and rejected his challenge to the meaningfulness of the investigation and evaluation of the 2014 claim.  (*See supra* Section IV.A.1.).  He also attempts to distinguish the ruling in *Williams* on the grounds that "Mr. McGrath did not even attempt to determine what future medical costs or pain and suffering the Plaintiff would incur because those items were not in the medical records he reviewed." (Pl.'s Br., ECF No. 89-2, at 30-31) (citing Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 110-12, 113-16).  But McGrath did summarize and consider the medical records, which referred on several occasions to the pain Tomaszewski was suffering.  (*See, e.g.*, Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, Ex. B at 30; 35-36).

For support, Tomaszewski turns to the Western District of Pennsylvania decisions in *Lewis* and *Parisi*.  But he yet again emphasizes deficiencies in the respective investigations, noting, for instance, that the defendant in *Lewis* did not obtain an examination under oath or an IME or have the medical records reviewed by an independent medical doctor and that the insurer in *Parisi* failed to account for pain and suffering in its evaluation.  (Pl.'s Br., ECF No. 89-2, at 23-24) (citing *Lewis*, 2019 WL 1651530, at *9; *Parisi*, 2018 WL 2107774, at *15).  He further observes that the insurer in *Lewis* "raised its reserve, but only made an initial offer of $10,000, which was 10% of the reserve." (*Id.*) (citing *Lewis*, 2019 WL 161530, at *9).  However, Tomaszewski acknowledges that he "does not make these contentions" that merely offering an amount substantially lower than the reserve and then increasing the reserve constituted bad faith.  (*Id.* at 30 n.4) (distinguishing *Segall v. Liberty Mut. Ins. Co.*, No. CIV. A. 99-6400, 2000 WL 1694026 (E.D. Pa. Nov. 9, 2000)).  The defendant in *Parisi* also "offered only one-third of the lowest of the [settlement] range" it calculated and, when it raised the offer without any explanation, it "was still below the lowest evaluation value." (*Id.* at 23-24) (citing *Parisi*, 2018 WL 2107774, at *15).

UIM claim because Encompass was entitled to a $15,000 credit due to the tortfeasor's liability coverage, Tomaszewski had pre-existing conditions related to his spine, and "Plaintiff's counsel did not present any medical records whatsoever related to the 2016 accident prior to filing the lawsuit." (*Id.* at 13). Furthermore, Encompass asserts that "Plaintiff's own conduct mitigates any finding of bad faith." (*Id.* at 14) (emphasis omitted). "Here, Plaintiff's repeated failures to provide Encompass with the information necessary to evaluate Plaintiff's claims certainly mitigate against any finding of bad faith on the part of Encompass]." (*Id.* at 15).

Tomaszewski argues that the evidence of Encompass's bad faith handling of both claims is clear and convincing because, "[a]s in *Parisi* and *Rancosky*, the evidence here clearly shows that Defendant wholly failed to conduct a meaningful investigation of these claims in a timely manner" and, on account of this insufficient investigation, failed to make any offer of settlement on the claim. (Pl.'s Br., ECF No. 89-2, at 24). He asserts that, "[r]egarding the 2016 claim, Encompass did nothing for almost two years except ask counsel for medical records and order surveillance of the Plaintiff." (*Id.* at 25) (citing Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6, Ex. D at 107, 119-20, 166-68). McGrath did not ask for permission to obtain his medical records from his medical providers and did not seek a statement under oath, an IME, or a medical records review. (*Id.* at 25). Tomaszewski takes particular issue with the McGrath's failure to request authorization to review the PIP file even though he already had access to the PIP notations in the Claim Notes and recognized that they "showed that Plaintiff's 'back was probably aggravated'" and he was receiving lumbar injections. (*Id.*) (quoting Def.'s Statement of Undisputed Mat Facts, ECT No. 87-10, Ex. J at 70). "Indeed, the PIP adjuster clearly received numerous medical records concerning Plaintiff's treatment for cervical, thoracic, and lumbar spine injuries after the 2016 accident, but, despite Plaintiff's claim of serious injuries

to his neck and back in the 2016 accident, Defendant unilaterally [and improperly] denied any [payment for] treatment of the lumbar region." (*Id.*) (citing Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-10, Ex. J at 29, 32, 48, Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-24 Ex. V; ECF No. 89-26, Ex X at 14). According to Tomaszewski, "Defendant was very good at peppering the Claim Notes with purported calls and letters to Plaintiff's counsel, but none of the activity was a *meaningful investigation of the* claim." (*Id.* at 25-26) (citing *Parisi*). Tomaszewski also challenges Encompass's determination to undertake surveillance and to conduct a check of his social media activities. (*Id.* at 26). He indicates that the claims adjuster thereby delayed the settlement of the claim against the tortfeasor, and chose "to focus on information that might support a denial while ignoring contrary information"—and that "only proactive investigation of the claims – focusing on bowling with an eye to reduce or deny Plaintiff's claims – [was] wholly improper and 'neither honest nor objective.'" (*Id.*) (citing *Rancosky*, 130 A.3d at 98; Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-26, Ex. X at 15).

Tomaszewski admits that "the duty of good faith applies to both parties," but he contends that Encompass "presents no evidence that Plaintiff's conduct warrants summary judgment on the claim." (*Id.* at 32) (footnote omitted). According to him, he provided Encompass with the information it requested regarding the 2014 claim, "while simultaneously working with Defendant on the 2016 claim" and "provid[ing] medical records to Defendant's PIP representative on the 2016 claim." (*Id.* at 33). He contends that, "[a]s Defendant concedes, Plaintiff had no obligation under the contract to perform an investigation of his own claim, to advise the Encompass to what he believed his claim was worth, or volunteer anything" and, on the contrary, it was Encompass that "was at all times obligated to perform a full, fair, thorough,

and prompt investigation and evaluation of Plaintiff's claims using any and all of the means it had contractually reserved the right to use for that purpose." (*Id.*) (adding that Encompass acknowledges that its obligation was not altered on account of Tomaszewski's legal representation).  Tomaszewski insists that, even though he cooperated with Encompass and inquired if there was other information it needed, "Defendant still delayed the claims without a reasonable basis to do so, doing the very bare minimum while desperately looking only for evidence to deny the claims, as its adjuster was tired and working overtime unable to perform all the tasks needed to complete the proper good faith investigations of Encompass's insureds and left unsupervised by his friend." (*Id.*).

Encompass responds that its representative "attempted to contact Plaintiff's counsel on seventeen occasions between May 2016 and April 2017, but again did not receive the courtesy of a return call, email, or letter." (Def.'s Reply Br., ECF No. 90, at 2) (citing Def.'s Statement of Undisputed Mat. Facts, ECF No. 87, at ¶¶ 80-97).  "On April 3, 2017, Encompass's representative finally had a telephone conversation with Plaintiff's counsel, who indicated that they would not provide medical records until Plaintiff's treatment was complete." (*Id.* at 3) (citing Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-2, ¶ 97).  According to Encompass, it then attempted to contact Plaintiff's Counsel sixteen times between May 2017 and May 2018 without any response and then made further attempts to communicate after it had consented to the settlement of the third-party claim in June 2018 and before the lawsuit was filed in December 2018.  (*Id.*).  "But not a single medical record regarding the 2016 accident was provided to [Encompass's] UIM representative before the lawsuit was filed." (*Id.*).  Encompass claims that it was entitled to rely upon counsel's promise to respond and provide information for its evaluation: "Plaintiff was ably represented by counsel during the presentation of the UIM

claim. Encompass did not act in bad faith by regularly and consistently communicating with Plaintiff's counsel, and reasonably relying upon counsel to provide documents for its review." (*Id.*) (further claiming that surveillance is not in and of itself bad faith).

In his sur-reply brief, Tomaszewski reiterates his assertion that he provided all the information requested concerning the 2014 claim and worked with Encompass on the 2016 claim, submitting medical records to the PIP representative. (Pl.'s Sur-Reply Br., ECF No. 94, at 5). In turn, he again takes McGrath to task because he never asked for an interview, never requested authorizations to obtain the medical records directly, never ordered a nurse or peer review of the medical records, never sought a statement under oath, and never asked for an IME. (*Id.*). He argues that "[t]he courts in *Parisi* and *Rancosky* both found these same delays and failures to conduct a meaningful investigation precluded summary judgment on the plaintiff's bad faith claims." (*Id.*) (citing *Parisi*, 2018 WL 2107774, at *14; *Rancosky*, 130 A.3d at 97-98).

This Court determines that a reasonable finder of fact could not find that there is clear and convincing evidence of bad faith in the handling of the 2016 claim. According to the Claim Notes, Encompass sent multiple letters (and several e-mails) to, and left numerous messages for, Plaintiff's Counsel inquiring about Tomaszewski's claim and treatment status. (*See* Def.'s Statement of Undisputed Mat. Facts, ECF No. 87-10, Ex. J at 20, 23, 29, 34, 39-47, 50-51, 53, 55-56, 58-62, 64, 67-69). No medical records were produced for purposes of the UIM claim, with Plaintiff's Counsel instead indicating that the records would not be provided until Tomaszewski completed his treatment. (*Id.* at 43, 51). Under the circumstances, McGrath perhaps should have taken other steps that were evidently available to him in order to obtain the requisite documentation (such as seeking authorization to access the PIP file or to obtain the medical records directly from the providers themselves). However, mere negligence is

insufficient to make out a bad faith claim, *see, e.g.*, *O'Donnell*, 734 A.2d at 905, and the insurer

need not undertake a "flawless" investigation.  *See, e.g.*, *Visconte*, 2012 WL 6524980, at *6.

      The Court is satisfied that Encompass has shown that it at least attempted to undertake an

investigation "sufficiently thorough [enough] to yield a reasonable foundation."  *Id.* (quoting

*Cantor*, 1999 WL 219786, at *2).  While an insured need not perform his own investigation or

volunteer information (Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts, ECF No. 89-6,

Ex. D at 66:7-17; 117:10-19, 144:2-12; 156:3-10, 169:16-24:), Tomaszewski acknowledges that

"the duty of good faith applies to both parties" (Pl.'s Br., ECF No. 89-2, at 32) (footnote

omitted).  In turn, the actions (or inaction) of the insured could be relevant to a bad faith claim

against the insurer.  *See, e.g.*, *Polselli v. Nationwide Mut. Ins. Co.*, 23 F.3d 747, 752 (3d Cir.

1994) (stating that on remand district court should consider unique circumstances including

whether filing of bad faith lawsuit before insurer completed investigation and cancellation of

deposition contributed to atmosphere unconducive to settlement), *on remand to* No. CIV.A. 91-

1365, 1995 WL 430571 (E.D. Pa. Jul. 20, 1995) (finding that plaintiff's actions did not

contribute to unconducive settlement environment and that cancellation of deposition was

justified).  In fact, a claim of "bad faith delay" implicates the basic question of whether or not the

"delay is attributable to the defendant."  *Murphy*, 2016 WL 1555926, at *3 (quoting *Thomer*, 790

F. Supp. 2d at 370).  Furthermore, although Tomaszewski appears to challenge Encompass's

refusal to pay certain medical bills, he has alleged and briefed claims of bad faith with respect to

the handling of his underlying UIM claims—and not his claims for PIP benefits.  He also does

not cite to any case law in support of his challenge to Encompass's decision to conduct

surveillance and review his social media activities.  Because the medical records were never

submitted, McGrath did not conduct a valuation of the claim considering the circumstances

weighing for and against Tomaszewski's 2016 UIM claim.[6]

## V.     CONCLUSION

For the foregoing reasons, the Court grants Encompass's motion for summary judgment.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

[6] In *Parisi*, the district court distinguished prior case law on the grounds that the insured's attorney "regularly supplied State Farm with medical records soon after they became available." *Parisi*, 2018 WL 2107774, at *14 n.163 (distinguishing *Richardson*, 2013 WL 235719, and *Rowe*, 6 F. Supp. 3d 621). The *Parisi* court also noted that "State Farm possessed robust records from Parisi's first-party claims file from the beginning," but there was no indication that (like here) the insurer had to obtain consent from the insured to consider these documents in its disposition of the UIM claim. *Id.* Additionally, the insurer in *Rancosky* conducted no investigation at all before terminating the policy despite receiving conflicting, uninformed, and incorrect documentation as to the insured's disability date as well as eight authorizations permitting the insurance company to contact the insured's physicians, employer, and others. *Rancosky*, 130 A.3d at 93-97. After the plaintiff had requested reconsideration, the insurance company merely reviewed the conflicting information already in its possession. *Id.* at 97-99.